## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| Jill Hetzel,<br><br>                Plaintiff,<br><br>v.<br><br>Richard V. Spencer, Secretary of the Navy,<br><br>                Defendant. | Civil Action No.<br>3:15-cv-7271 (PGS) (TJB)<br><br>**MEMORANDUM<br>AND ORDER** |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on a motion by defendant for summary judgment pursuant to Fed. R. Civ. Proc. 56(c). This is an employment discrimination case in which plaintiff alleges sex and pregnancy discrimination, pursuant to Title VII, 42 U.S.C. 2000e-16; 2000e-5; disability discrimination, pursuant to Title VII, 42 U.S.C. 2000e-16, 2000e-5; and hostile work environment, pursuant to the Rehabilitation Act, 29 U.S.C. 791.

### FACTUAL BACKGROUND

Plaintiff Jill Hetzel is a former civilian employee of the Department of the Navy in Colts Neck, New Jersey. (Third Amended Complaint, ECF No. 16, at ¶ 14). She worked as a Child Youth Program Assistant in the infant room of the Child Development Center ("CDC") until the events underlying this action. (Declaration of Christopher Amore ("Amore Decl."), Deposition of Hetzel ("Hetzel Dep."), at 15:23 to 16:4; 33:25 to 34:1). Her employment began in August 1998 and continued until her termination in August 2011. (*Id.*, at 15:23 to 16:4).

In late 2009, long before the incident at issue here, plaintiff's supervisor, Michele Cavet, discovered that she had been selling bootleg DVDs to her co-workers while at work. (Amore Decl.,

Ex. C). This conduct was found to be in violation of internal standards of conduct, which prohibit soliciting sales at work for personal gain. (*Id.*). Cavet suspended plaintiff for the violation by letter dated October 20, 2009. (Amore Decl., Ex. C). However, apart from this isolated incident, her performance at work was generally satisfactory. (Declaration of Thomas DeNoia ("DeNoia Decl."), Ex. E, Deposition of Mary Borree ("Borree Dep."), at 23:17 to 24:1.

In March 2011, the CDC closed the infant room, and plaintiff was transferred to the pre-toddler room and was responsible for children between one and two years old. (Hetzel Dep., at 33:14 to 34:3). Plaintiff testified that her supervisor promised she would be reassigned to the infant room when it reopened. (Hetzel Dep., at 38:21 to 39:4). Within the same time frame, plaintiff became pregnant, and allegedly she advised Cavet. (DeNoia Decl., Ex. D, Deposition of Joan Fantozzi ("Fantozzi Dep."), 17:3 to 11). When the infant room reopened (April, 2011), plaintiff asked to be reassigned to the infant room; but Cavet responded that pregnant women are no longer being placed into that assignment. (Hetzel Dep., at 39:11 to 13; Denoia Decl., Ex. A, at 000013). Defendant denies that such a policy existed. (Defendant's Statement of Material Facts, at ¶ 5).

Plaintiff began to suffer complications with her pregnancy and on April 28, 2011, was diagnosed with a subchorionic hemorrhage. Dr. John Sutherland restricted her from working until May 2, 2011. (Amore Decl., Ex. D, at 000221). On that day, after reevaluating her, Dr. Sutherland permitted plaintiff to work but "restrict[ed] the amount of weight to be lifted by [her] to no more than five pounds." (Amore Decl., Ex. D, at 000222). Plaintiff's supervisor gave her the choice to either work in another department in a position that did not require lifting for reduced pay, or to take unpaid leave. (Hetzel Dep., at 57:1 to 5). Plaintiff elected to work answering phones in the ITT[1] office for a reduced hourly wage. (Hetzel Dep., at 57:6 to 8).

---

[1] Information Tickets and Travel office. (*See* Borree Dep., ex. MB-3, at 4).

2

On May 20, 2011, Plaintiff obtained another doctor's note stating she should retain a light duty work schedule. (Amore Decl., Ex. D, at 000223). Plaintiff testified that Mary Borree, her supervisor at the ITT office, advised that she could not remain on light duty, and that she must return to her original position, or use her family leave time or sick time. (Hetzel Dep., at 59:9 to 15).

On June 16, 2011, a doctor cleared plaintiff "to go back to work as of 6/17/11," and stated she would work "as before." (Amore Decl., Ex D, at 000226). Pursuant to CDC policy, Dr. Karen Stephenson, M.D., a Navy doctor, also examined plaintiff. She cleared plaintiff to return to full duty; and recommended she be placed in the infant room because "it is less physical than the pretoddler and toddler rooms." (Amore Decl., Ex. D, at 000227). Plaintiff testified that Cavet, upon reading the note, became annoyed and shouted, "Oh, come on, Jill. This is ridiculous. Get out of my office. . . . I'll have to figure this out and make some phone calls." (Hetzel Dep., at 61:17 to 24).

Emails obtained in discovery indicate Cavet immediately notified human resources about the note. (Borree Dep., at 000154). An internal human resources email chain ensued; one noted that plaintiff had "been asking for the infant room" and suggested that the doctor's note seemed "a bit manipulative." (*Id.*). In another email that same day, a human resources employee, stated,

> Cleared for duty is cleared for duty. I'm sure she went in there and told them to put that because she knows the doctor/parent . . .
>
> Either way – based on this note schedule her where you need her – regardless of whether it is where she wants to go or not. If she gives you another note with limitations – we will go through this drill again and take her out of the facility with the same pay cut. And if she becomes disruptive in the workplace in the meantime – we will address it with disciplinary action.
>
> Please keep us posted.

3

(Borree Dep., at 000153). Despite Dr. Stephenson's invitation to call her "with any questions," (Amore Decl., Ex. D, at 000227), there is no evidence that anyone at human resources contacted either Dr. Stephenson or plaintiff to clarify the note.

Cavet assigned Plaintiff to the pre-toddler room beginning in June 2011. (Hetzel Dep., at 63:1 to 12). Plaintiff admitted in her deposition that she was physically able to work in the rooms for several age groups at the CDC, and that she was not opposed to her assignment in the pre-toddler room. (Hetzel Dep., at 76:1 to 10; 63:5 to 12). Plaintiff testified that during this time, some discriminatory comments against her were made by coworkers. One comment was made by Cavet. She stated "Oh come on Jill, don't get all pregnancy crazy on me," after plaintiff returned from a restroom break. (Hetzel Dep., at 27:14 to 19).

Another allegedly discriminatory comment was made by coworker Dalia Ghosal. Evidently, on August 4, 2011, while plaintiff was on duty, a child fell in the pre-toddler room, and was bleeding. (Amore Decl., Ex. F, Hetzel Decl., at 000075). Dalia Ghosal carried the child to a changing table and treated the child's lip with an ice pack. (Hetzel Dep., at 84:16 to 19; Ghosal Dep., at 42:5 to 8). In a statement, Ghosal claimed plaintiff did not respond to the incident, and did not assist in cleaning up the blood on the floor. (Amore Decl., Ex. Q).

Plaintiff disputes Ghosal's characterization, contending that her job responsibilities require that she remain with the other children during the incident, and call for a supervisor, as she did. (Hetzel Dep., at 84:16 to 24). Moreover, the "Emergency Response Training" procedures require that a Youth Program Assistant "call for a supervisor" when a child is injured. (Amore Decl., Ex. H). Borree also admitted in her deposition that in such a situation it "would be a good practice" for one caretaker to "take care of the child that's injured and the other caregiver to watch the other children." (Borree Dep., at 19:6 to 10).

4

A third discriminatory comment was made by coworker Marina Bartko. On July 27, 2011, Marina Bartko, who was also pregnant and worked in the infant room, reported to supervisors that plaintiff had been speaking negatively about her; stared at her while she was tending to children; rolled her eyes at her; and gave her "nasty" looks. (Amore Decl., Ex. S, at 000209). Borree initiated a "hostile work environment" investigation, and the investigation substantiated Bartko's allegations. (Borree Dep., at 48:9 to 13).

Overall, Plaintiff alleges that after submission of Dr. Stephenson's memo on July 17, 2011, the three negative comments were used as a pretext for discrimination against her. One of the June 17, 2011 emails specifically contemplated potential future disciplinary action. (*See* DeNoia Decl., Ex. E, at 000153). In that email, a human resources employee instructed Borree to obtain "a detailed statement" from Bartko and other caregivers and proposed, "Once the information is gathered and reviewed, we can recommend the appropriate course of action." (DeNoia Decl., Ex. L, at 000168). In another email, it noted that Bartko may "resign as a result" of plaintiff's alleged conduct, and lamented that "[t]his would, of course, provided Jill Hetzel with just the opportunity she is looking for, i.e. to get a slot in the infant room." DeNoia Decl., Ex. M, at 000165. During the investigation, Borree testified that Cavet, who allegedly made the improper comments to plaintiff, chose the employees to be interviewed, reviewed the tape of the incident, and provided evidence to her. Borree Dep., at 20:3 to 4; 29:2 to 5; 30:21 to 25.

On August 30, 2011, after the investigation was complete, Borree issued a proposed termination letter to plaintiff, which cited the following:

1) Unprofessional and/or disrespectful behavior in the workplace;

2) Inattention to duty based on testimony by Ghosal and that Plaintiff regularly refused to perform her share of the work; and

5

    3) Failure to follow emergency response procedures.

(Amore Decl., Ex. G, at 000013). The termination letter also cited to a prior seven-day suspension in 2009. (*Id.*) On September 15, 2011, Richard Carlson, the Regional Deputy Director of Morale, Welfare, and Recreation, approved Borree's proposed letter and issued a final termination letter to Hetzel. (Amore Decl., Ex I).

In January 2012, plaintiff filed an Equal Employment Opportunity complaint, alleging disability discrimination based on her pregnancy. (Amore Decl., Ex J). In April, the EEO office initiated an investigation, and on December 8, 2015, the Navy issued a final agency decision finding no evidence of discrimination in connection with Plaintiff's termination. (Balcher Decl., Ex. I).

On October 1, 2015, plaintiff filed a complaint commencing this action, (ECF No. 1), and filed an amended complaint on April 27, 2016. (ECF No. 16). On August 4, 2016, this Court issued an order on defendant's motion to dismiss (1) permitting plaintiff's sex discrimination complaint to proceed under Title VII, but not under the Rehabilitation Act; (2) permitting plaintiff's hostile work environment claim to proceed under Title VII but not under the Rehabilitation Act; (3) permitting plaintiff's disability discrimination claim to proceed under the Rehabilitation Act but not under Title VII; and (4) dismissing plaintiff's retaliation claim. (ECF No. 24). On May 17, 2018, defendant filed this motion for summary judgment. (ECF No. 38).

## LEGAL ANALYSIS

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant,

and it is material if, under the substantive law, it would affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence "is to be believed and all justifiable inferences are to be drawn in [her] favor." *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Twp.*, 772 F.2d 1103, 1109 (3d Cir. 1985). The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130-31 (3d Cir. 1995). "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment." *Schoch v. First Fidelity Bancorp.*, 912 F.2d 654, 657 (3d Cir. 1990); *see also* Fed. R. Civ. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial"). Moreover, only disputes over facts that might affect the outcome of the lawsuit under governing law will preclude the entry of summary judgment. *Anderson*, 477 U.S. at 247-48. If a court determines, "after drawing all inferences in favor of [the non-moving party], and making all credibility determinations in [her] favor" that no reasonable jury could find for [her], summary judgment is appropriate. *Alevras v. Tacopina*, 226 Fed. App'x. 222, 227 (3d Cir. 2007).

Discrimination claims must be analyzed according to the burden-shifting framework which was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and later clarified in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981),

and *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993). *See also Wishkin v. Potter*, 476 F.3d 180, 185 (3d Cir. 2007) (noting that the "familiar" *McDonnell Douglass* analysis is "equally applicable to discrimination claims under the Rehabilitation Act"). In the first of three steps, a plaintiff must present sufficient evidence to support a prima facie case of discrimination. *Hicks*, 509 U.S. at 506. To establish such a prima facie case, the plaintiff must show that "(1) [she] belongs to a protected class; (2) [she] was qualified for the position; (3) [she] was subject to an adverse employment action . . . ; and (4) under circumstances that raised an inference of discriminatory action." *McDonnell Douglas*, 411 U.S. at 802.

### Adverse Employment Action

Regarding plaintiff's sex and pregnancy discrimination claims, defendant concedes that she has established a prima facie case as to the first and second prongs, (Def. Brief, at 14), but challenges the sufficiency of the evidence under the third prong – an adverse employment action. "The Third Circuit has defined an adverse employment action as an action that alters the employee's compensation, terms, conditions, or privileges of employment." *Cortes v. Univ. of Med. & Dentistry of New Jersey*, 391 F. Supp. 2d 298, 312 (D.N.J. 2005) (internal quotation marks and citations omitted). However, "not everything that makes an employee unhappy qualifies as [discrimination], for otherwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997).

Plaintiff's assignment to the pre-toddler room was not adverse to her employment, a fact plaintiff appears to concede. (*See* Plaintiff's Brief, at 12-13). No evidence suggests that plaintiff's reassignment affected her compensation or her terms, conditions, or privileges of employment. Plaintiff's termination was, however, plainly an adverse employment action. *See Abramson v.*

*William Paterson College of New Jersey*, 260 F.3d 265, 288 (3d Cir. 2001) (recognizing that termination "clearly" constitutes an adverse employment action).

Circumstances that Raise an Inference of Discrimination

At the summary judgment stage in a case alleging discriminatory termination, the fourth prong of the *McDonnell Douglas* test requires that "under circumstances that raise an inference of discriminatory action, the employer continued to seek out individuals with qualifications similar to the plaintiff's to fill the position." *Sarullo v. United States Postal Serv.*, 352 F.3d 789, 797 (3d Cir. 2003). "The 'central focus' of the prima facie case 'is always whether the employer is treating some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Id.* at 798 (quoting *Pivirotto v. Innovative Sys., Inc.*, 181 F.3d 344, 352 (3d Cir. 1996)).

Evidence in the record supports plaintiff's claims that she was treated less favorably because of her pregnancy. Plaintiff testified that a supervisor explicitly told her that no pregnant women were to be assigned to the infant room. She also points to multiple statements from Cavet, including her statement about plaintiff being "pregnancy crazy" and the hostile reaction to her doctors' notes. In addition, immediately after viewing the June 17 note, Cavet initiated a conversation with human resources personnel – the same individuals who were in the discussion leading up to plaintiff's termination – which contemplated "disciplinary action."

Moreover, although Bartko, who was also pregnant, was assigned to the infant room, there is evidence indicating that defendant did not know of Bartko's pregnancy while she was working in the infant room. DeNoia Decl., Ex. H, Borree Decl., at 000061. Also, despite evidence that Estelle Roman, another pregnant employee, purportedly provided occasional coverage in the infant room, plaintiff's alleges she lost her *permanent* assignment in that room. *See* Amore Decl., Ex. B, Plaintiff's Answers to Interrogatories, at question 17.

Though plaintiff's reassignment was not an adverse employment action, the alleged policy against assigning pregnant women in the infant room; Cavet's statement; and her and others' actions and statements, and the chain of emails leading to plaintiff's termination set forth a prima facie case that the circumstances surrounding plaintiff's termination raise an inference of discrimination.

### Employer's Reason for Termination

At step two of the burden-shifting analysis, if the plaintiff establishes a prima facie case, "the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action." *Stouch v. Twp. of Irvington*, 354 Fed. App'x 660, 666 (3d Cir. 2009). "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). However, at this stage, the employer does not have to prove that the "articulated reason actually motivated the action"; rather, "[t]he proffered reason need only raise a genuine issue of fact as to whether the employer acted impermissibly." *Shellenberger v. Summit Bancorp*, 318 F.3d 183, 189 (3d Cir. 2003).

Defendant has identified three nondiscriminatory reasons for terminating plaintiff: (1) her failure to respond to the incident involving the injured child; (2) Plaintiff's workplace behavior; and (3) Plaintiff's 2009 reprimand letter, which satisfy defendant's limited burden at step two.

### Mere Pretext

Finally, at step three, if the employer articulates a non-discriminatory basis for the adverse employment action, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." *Burton*, 707 F.3d at 426. "To make a showing of pretext, 'the plaintiff must point

to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 427 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). "To discredit the employer's proffered reason . . . the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). As such, to survive summary judgment, the plaintiff must either "present sufficient evidence to meaningfully throw into question" the employer's proffered reasons or "come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision." *Fuentes*, 32 F.3d at 765.

The evidence, viewed in plaintiff's favor, throws defendant's stated reason into question. The 2009 reprimand letter long preceded plaintiff's termination. In her deposition, Borree declined to cite this incident as a reason for the termination and failed to mention it when asked about plaintiff's evaluations prior to her termination. (*See* Borree Dep., at 23:8 to 13). Borree also admitted that although a major reason for termination was her inability "to protect and take care of the children, specifically the incident in the room with the child getting hurt," her investigation was incomplete. She did not review the tape of the alleged incident and relied only upon the statements of others.[2] (*Id.* at 19:20 to 21:4; 23:8 to 13). Borree also admitted plaintiff's actions, according to plaintiff's version of events, appeared to be a good practice. (*Id.* at 19:6 to 10).

---

[2] Plaintiff claims the surveillance video, relied upon by the CDC during the investigation, has been lost or destroyed, which, she argues, warrants an adverse inference. Consistent with the appropriate summary judgment standard, the Court shall view the facts in the light most favorable to plaintiff (the nonmoving party) and shall address the applicability of an adverse inference pre-trial.

11

Moreover, Borree prepared the email dismissing Dr. Stephenson's note and contemplating future disciplinary action if plaintiff "becomes disruptive in the workplace." (DeNoia Decl., Ex. F, at 000153). Viewing the email together with the alleged statements by plaintiffs' supervisor about pregnancy, the alleged policy against placing pregnant women in the infant room, the fact that no women known to be pregnant were in fact assigned to the infant room, and Cavet's impatience with the complications relating to plaintiff's pregnancy all serve to undermine defendant's proffered reason for her termination and indicate that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision.

## Disability Discrimination

Defendant contends plaintiff has not established disability discrimination. "Pregnancy, alone does not constitute disability." *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016); *Brennan v. Nat. Telephone Directory Corp.*, 850 F. Supp. 331, 344 (E.D. Pa. 1994). Count Three lists plaintiff's pregnancy as the basis of her disability discrimination claim and makes no reference to her subchorionic hemorrhage or any other alleged disability. Plaintiff appears to concede that she cannot establish disability discrimination, having declined to argue this point in her brief. The Court shall therefore grant summary judgment in favor of defendant on Count Three of plaintiff's Third Amended Complaint.

## Hostile Work Environment

To establish a hostile work environment claim a plaintiff must demonstrate: "(1) she suffered intentional discrimination because of her [membership in a protected class]; (2) the discrimination was severe or pervasive; (3) the discrimination detrimentally affected her; (4) it would have detrimentally affected a reasonable person in like circumstances; and (5) a basis for employer liability is present." *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir.2006), *overruled in part*

*on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006). Establishing that a work environment was hostile requires a demonstration that "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and created an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 65, 67 (1986)). "'[T]he mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability.'" *Brown–Baumbach v. B & B Auto., Inc.*, 437 F. App'x 129, 133 (3d Cir.2011) (quoting *Weston*, 251 F.3d at 428).

Plaintiff's allegations suggest the discriminatory actions were pervasive. There were (1) several comments by Cavet in response to her doctors' notes and another comment about her being "pregnancy crazy;" (2) the Ghosal complaint where the child was injured appears to have been ??? found against her; and (2) the Bartko complaint about plaintiff's nasty looks is very subjective, and the email chain indicates the supervisors had a preconceived plan for her termination based on her pregnancy. Together, these actions show the workplace was permeated with discriminatory ridicule.

## ORDER

Having carefully reviewed and taken into consideration the submissions of the parties, as well as the arguments advanced; for good cause shown, and for the foregoing reasons;

IT IS on this 19th day of November, 2018,

ORDERED that defendant's motion for summary judgment (ECF No. 38), be and hereby is granted in part; and it is further

ORDERED that Count III is dismissed.

_____
PETER G. SHERIDAN, U.S.D.J.